OPINION
{¶ 1} Appellant, Jodi Flax ("Mother"), appeals the decision of the Fayette County Court of Common Pleas, Juvenile Division, granting legal custody of her daughter, Blayke, to the child's father, appellee, Michael Wise ("Father"). For the reasons set forth below, we affirm the trial court's judgment. *Page 2 
 {¶ 2} Blayke was born on June 21, 2002 to Mother and Father who were never married. In December 2003, the Fayette County Child Support Enforcement Agency established paternity and determined the existence of a parent-child relationship between Father and Blayke and soon after, established Father's child support obligations. A magistrate later granted Father temporary visitation in accordance with Option I of the Fayette County Companionship Guidelines amounting to scheduled visits every other weekend. However, no permanent orders for the allocation of parental rights and responsibilities were in place.
 {¶ 3} While under Father's care, Blayke spent time in Father's home which he shares with his wife. Father also has shared parenting of his other children so that Blayke visited with some of her half-siblings during the weekends she spent with Father. Otherwise, Blayke lived in Mother's house which is also the residence for Mother's two other children.
 {¶ 4} At the hearing, there was testimony that on multiple occasions, Father picked up Blayke from Mother's care and found the child's appearance disheveled, noticed that she was ill, or he had to wait for Mother to locate and collect Blayke's coat or shoes from other homes in the neighborhood. One such house belonged to Brad Flora, Mother's boyfriend, where he lived with his wife and three children. Testimony revealed that Blayke and her half-siblings would often join Mother in spending the night at Flora's house while Flora's wife and children were also present. In addition, Blayke had documented dental issues which resulted in nine cavities by the time she was four years old. Though the cavities were eventually filled, one cap fell off her repaired tooth and approximately five months went by before the tooth was treated.
 {¶ 5} After being laid off from his job, Father became delinquent on his child support obligations for Blayke and Mother filed a Motion for Contempt on this basis in September 2006. Father answered and moved for legal custody of Blayke and requested that Mother *Page 3 
pay child support to Father. The trial court found that it was in Blayke's best interest that Father have legal custody and that Mother begin to pay child support. The court also awarded Mother parenting time based on Option I of the Fayette County visiting guidelines.
 {¶ 6} Mother now appeals the trial court's decision granting legal custody of Blayke to Father, advancing a sole assignment of error.
 {¶ 7} Assignment of Error No. 1:
 {¶ 8} "THE JUVENILE COURT ABUSED ITS DISCRETION TO THE PREJUDICE OF APPELLANT IN AWARDING CUSTODY OF [BLAYKE] TO APPELLEE."
 {¶ 9} In her assignment of error, Mother argues that the custody award of Blayke to Father was an abuse of discretion because the trial court failed to properly consider the applicable statutory and nonstatutory factors when determining the best interest of the child. Mother also contends that the trial court failed to take important and relevant evidence into account when analyzing the appropriate issues. Lastly, Mother argues that the decision was against the manifest weight of the evidence because the trial court relied on insufficient evidence when considering nonstatutory factors. We find these arguments without merit.
 {¶ 10} The standard of review in initial custody cases is whether the trial court abused its discretion.[1] Davis v. Flickinger,77 Ohio St.3d 415, 416-17, 1997-Ohio-260. More than mere error of judgment, an abuse of discretion requires that the court's attitude was unreasonable, arbitrary, or unconscionable. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219. Given the nature and impact of custody disputes, the juvenile court's discretion will *Page 4 
be accorded paramount deference because the trial court is best suited to determine the credibility of testimony and integrity of evidence.Gamble v. Gamble, Butler App. No. CA2006-10-265, 2008-Ohio-1015, ¶ 28. Specifically, "the knowledge a trial court gains through observing witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record." Miller v. Miller (1988),37 Ohio St.3d 71, 74.
 {¶ 11} When an appellate court determines whether a trial court's decision is against the manifest weight of the evidence, it is "guided by the presumption that the trial court's findings were correct."Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77, 80. In legal custody proceedings, a juvenile court's determination must be supported by a preponderance of the evidence so that the evidence relied on must be of greater weight or more convincing than the evidence offered in opposition to it. In re A.C., Clermont App. No. CA2006-12-105,2007-Ohio-3350, ¶ 14. Therefore, giving the trial court due deference, a reviewing court will not reverse the findings of a trial court when the award of custody is supported by a substantial amount of credible and competent evidence. Davis at 418.
 {¶ 12} R.C. 3109.04 governs parental rights and responsibilities. When awarding custody, the primary concern is the best interest of the child.Gamble at ¶ 25. When determining what is in the best interest of the child, a court shall review all relevant factors, including those listed in R.C. 3109.04(F)(1). Id.
 {¶ 13} The R.C. 3109.04(F)(1) factors pertinent to the current case include: (c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest; (d) The child's adjustment to the child's home, school, and community; (e) The mental and physical health of all persons involved in the situation; (f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights; and (g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant *Page 5 
to a child support order under which that parent is an obligor.
 {¶ 14} The trial court made numerous findings related to the best interest factors. Though Father had fallen behind on his child support obligations because he was laid off, that single factor was not dispositive of Blayke's best interest. Instead, the court considered all relevant factors relating to Father and his interaction with Blayke. Specifically, the court found that witnesses for both sides established that Blayke has a good relationship with Father, Father's other children (Blayke's half-siblings), and Father's wife.
 {¶ 15} Subsequently, the court applied the factors when considering if it was in Blayke's best interest to vest custody in Mother. First, it found that Mother did not cooperate with Father in establishing or facilitating parenting time. The record demonstrates that upon numerous occasions, Mother refused to answer the call when Father's number showed up on caller-ID. Additionally, testimony indicates that when Father picked up Blayke for his visitation, he would call approximately 15 minutes before he arrived. Upon arrival, however, he would be forced to wait as Mother gathered Blayke's clothes from neighborhood homes or tried to clean her up and brush her teeth.
 {¶ 16} Second, the court acknowledged Mother's lack of concern for Blayke's dental health. The record reveals that Blayke had nine cavities by the age of four and while enamel issues may have been genetic, Mother did not have the cavities treated until Fayette County Job and Family Services investigated a referral regarding Blayke's lack of dental health. The case worker assigned to investigate the referral testified that when she questioned Mother regarding Blayke's cavities, Mother's response was that she did not have transportation to the dentist. Additionally, Mother testified that after the cavities were filled, a cap fell off and yet she failed to have Blayke's tooth treated for several months.
 {¶ 17} The court then considered Mother's boyfriend, Brad Flora, and how that relationship affected Blayke and the determination of her best interest. Mother testified that *Page 6 
she began seeing Flora in December, 2005 and that she and her children (including Blayke) had at one point, spent an average of two to three nights a week at Flora's house while his wife and three children were also present. Mother also testified that since the school year began, Flora would stay at Mother's home four to five nights a week. According to Mother, Flora had once mixed prescription sleeping pills with alcohol and had to be taken to the hospital to "sober up" because his alcohol level was "really high." Additionally, upon cross-examination, Mother explained that both she and Flora call Blayke "Thorn." Mother testified that the nickname alludes to the colloquialism "thorn in his side" which pertained to Blayke because she disrupted Flora while he tried to watch television.
 {¶ 18} The court also heard testimony regarding Mother and Flora's participation in a bowling league where drinking and smoking were prevalent. Father testified that he met Mother at the bowling alley to drop off Blayke after a visit but did not want to turn her over because he witnessed drinking and smoking in the alley and specifically at the table where Mother and Flora were. Over Father's objections, Mother took Blayke into the bowling alley and informed Father that he could use it against her in court.
 {¶ 19} The trial court then weighed all testimony in light of the R.C. 3109.04 factors and determined that Mother's actions were "unconventional behavior in the extreme and [thwart sic] with all kinds of problems. They all go to the issue of proper judgment on the part of a parent in matters concerning the child's welfare." The court, therefore, concluded that granting custody to Father and naming him residential parent was in Blayke's best interest.
 {¶ 20} The record is replete with disparity between the parties' choices, judgment, and capacity to parent. The court had ample evidence to determine that though Blayke spent her early years in the primary care of Mother, Mother's actions and judgment placed her on unequal footing when viewed against the very positive relationship Father shared with his daughter. *Page 7 
 {¶ 21} After careful review of the record, we find competent, credible evidence supporting the trial court's decision that it was in Blayke's best interest to grant legal custody to Father, that the trial court properly considered applicable statutory factors, and that the trial court's decision was not against the manifest weight of the evidence. Appellant's assignment of error is therefore overruled.
 {¶ 22} Judgment affirmed.
WALSH, P.J. and BRESSLER, J., concur.
[1] This case involves an initial custody determination. Mother was unmarried when she gave birth to Blayke and because of that was considered the sole residential parent and legal custodian. R.C. 3109.042 states that "an unmarried female who gives birth to a child is the sole residential parent and legal custodian of the child until a court of competent jurisdiction issues an order designating another person as the residential parent and legal custodian." Additionally, prior to Father filing his custody motion, there were no orders in place which allocated parental rights and responsibilities. Therefore, there is no need to analyze the factors laid out in R.C. 3109.04(E)(1)(a) which governs the modification of an existing decree. See Horning v.Wolff, Stark App. No. 2005-CA-00310, 2006-Ohio-6397 (disregarding change in circumstance factors when determining initial custody of an unmarried couple's daughter). *Page 1